No. 16-16663

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MANUEL DE JESUS ORTEGA MELENDRES, on behalf
of himself and all others similarly situated, et al.,
*Plaintiffs-Appellees*,

UNITED STATES OF AMERICA,
*Intervenor-Plaintiff-Appellee*,

v.

JOSEPH ARPAIO, et al.,
*Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA AT PHOENIX
No. 2:07-CV-2513 (Honorable G. Murray Snow, United States District Judge)

**BRIEF OF DEFENDANT-APPELLANT JOSEPH ARPAIO AND
NON-PARTY APPELLANTS GERARD SHERIDAN AND JOSEPH SOUSA**

John T. Masterson
Joseph J. Popolizio
Justin M. Ackerman
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue
Suite 2700
Phoenix, AZ 85004
(602) 263-1700
(602) 200-7846 (fax)
jmasterson@jshfirm.com

Charles J. Cooper
Michael W. Kirk
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Counsel for Defendant-Appellant Joseph Arpaio and
Non-Party-Appellants Gerard Sheridan and Joseph Sousa*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34, Appellants Joseph M. Arpaio, Gerard Sheridan, and Joseph Sousa respectfully request oral argument. Appellants submit that oral argument will assist the Court in deciding important questions concerning the limits of federal courts' equitable-remedy and contempt powers, and concerning the judicial recusal statutes. Oral argument may also assist the Court in its consideration of the lengthy record of this case.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF ISSUES ...............................................................3

STATEMENT OF THE CASE............................................................3

A.    The Monitor Authority Order and This Court's Partial Vacatur....................4

B.    The Order To Show Cause ...................................................5

C.    The Contempt Findings, Contempt Injunction, and Criminal Referral..........6

D.    Judge Snow and the Monitor's Extensive *Ex Parte* Communications
      About the Merits of the Case.........................................................7

      1.    The MCSO's decision to close certain criminal investigations..........15

      2.    The adequacy of MCSO's internal investigations .............................15

      3.    The Dennis Montgomery investigation................................................16

      4.    Trombi's May 14, 2014 email............................................................17

      5.    The credibility and good faith of witnesses .......................................17

      6.    Compliance with court orders regarding internal investigations
            and document production ...................................................................18

      7.    The Armendariz investigation............................................................19

      8.    The need to expand the Monitor's authority ......................................19

      9.    Sources of MCSO funding .................................................................19

E. The May 2015 Recusal Motion ....................................................21

STANDARD OF REVIEW .................................................................25

SUMMARY OF ARGUMENT ...........................................................26

ARGUMENT ......................................................................................29

I. The Contempt Injunction Violates Well-Established
Limits on Federal Judicial Authority............................................29

  A. The Wholesale Regulation of Internal Affairs Flouts
*Melendres II* and Exceeds the District Court's Powers ......................30

    1. *The district court exceeded its power to issue equitable
remedial relief* ................................................................30

    2. *The wholesale regulation of Internal Affairs oversteps
the court's civil contempt power* ..............................................35

  B. The District Court Exceeded Its Authority By Granting the
Monitor Direct Authority To Conduct Internal Investigations
Related to Members of the Plaintiff Class ............................................37

  C. The District Court Exceeded Its Authority by Reopening
Closed Internal Affairs Investigations To Punish MCSO
Personnel for Past Actions .................................................39

II. Judge Snow and the Monitor Must Be Disqualified .....................................43

  A. *Ex Parte* Communications About the Merits
Require Disqualification .................................................43

  B. The *Ex Parte* Conversations Between Judge Snow
and the Monitor Require Reassignment...............................................46

  C. The Evidence that Judge Snow "Hated" Arpaio and
Sought To Drive Him from Office Requires Disqualification............52

  D. Judge Snow's Conflict Regarding His Brother-in-Law
Also Requires Disqualification .........................................54

E.     Timeliness Concerns Cannot Bar Disqualification in This Case........56

CONCLUSION ........................................................................................59

STATEMENT OF RELATED CASES .....................................................60

STATUTORY ADDENDUM .............................................................SA1

## TABLE OF AUTHORITIES

**Cases**                                                 **Page**

*American Textiles Mfrs. Inst., Inc. v. The Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ............................................................. 52

*American-Arab Anti-Discrimination Comm. v. Reno*,
70 F.3d 1045 (9th Cir. 1995) ............................................................. 43

*California v. Montrose Chem. Corp. of California*,
104 F.3d 1507 (9th Cir. 1997) ............................................... 26, 44, 57

*Cobell v. Kempthorne*, 455 F.3d 317 (D.C. Cir. 2006) ........................... 44

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979) ......................... 40

*Cordoza v. Pacific States Steel Corp.*, 320 F.3d 989 (9th Cir. 2003) ............... 44, 50

*Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864 (9th Cir. 1991) .................. 58

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992) .............. 57

*Earp v. Cullen*, 623 F.3d 1065 (9th Cir. 2010) ...................................... 44

*Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996) ............................ 2, 28, 44, 46, 50

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983) ................................................ 29, 36, 42

*First Interstate Bank of Ariz.*, *NA* v. *Murphy, Weir & Butler*,
210 F.3d 983 (9th Cir. 2000) ............................................................. 52

*Guenther v. Comm'r*, 939 F.2d 758 (9th Cir. 1991) ...................... 43, 46, 49

*Guenther v. Comm'r*, 889 F.2d 882 (9th Cir. 1989) .......................... 43, 49

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982) ......................... 34, 38, 44

*Horne v. Flores*, 557 U.S. 433 (2009) ................................................. 35

*In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) ............................. 2, 28, 51

*In re Ellis*, 356 F.3d 1198 (9th Cir. 2004) ..................................... 44, 49

*In re Kensington Int'l, Ltd.*, 368 F.3d 289 (3d Cir. 2004) ............... 2, 28, 44, 50, 57

*In re Manoa Fin. Co.*, 781 F.2d 1370 (9th Cir. 1986) ............................ 57

*In re Marshall*, 721 F.3d 1032 (9th Cir. 2013) ................................ 25, 26

*International Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) ........................................................... 29, 36, 42

v

*Kendrick v. Bland*, 740 F.2d 432 (6th Cir. 1984) ..................................................41

*Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*,
  748 F.3d 160 (4th Cir. 2014) .................................................................58

*McCrone v. United States*, 307 U.S. 61 (1939) ...............................................42

*Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) ............ 1, 5, 26, 29, 30, 32, 34

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..................................................4

*Milliken v. Bradley*, 433 U.S. 267 (1977) ...........................................................41

*National Org. for the Reform of Marijuana Laws v. Mullen*,
  828 F.2d 536 (9th Cir. 1987) .......................................................27, 38

*Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977) .............................................41

*Noli v. Comm'r*, 860 F.2d 1521 (9th Cir. 1988) ................................................26

*Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77 (2d Cir. 1996) ..............................54

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)..........................35

*Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415 (Fed. Cir. 1989)...............58

*Potashnick v. Port City Constr. Co.*, 609 F.2d 1101 (5th Cir. 1980) ....................54

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) ........................................34

*Printz v. United States*, 521 U.S. 898 (1997).............................................................35

*Salmeron v. United States*, 724 F.2d 1357 (9th Cir. 1983)....................................58

*SCA Servs. v. Morgan*, 557 F.2d 110 (7th Cir. 1977).............................................58

*Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir. 1986).........................25, 27, 38, 40

*United States v. Alverson*, 666 F.2d 341 (9th Cir. 1982)............................43, 49, 57

*United States v. Craven*, 239 F.3d 91 (1st Cir. 2001)........................................44, 47

*United States v. Furst*, 886 F.2d 558 (3d Cir. 1989) ..............................................57

*United States v. Hernandez*, 109 F.3d 1450 (9th Cir. 1997) ...................................58

*United States v. Holland*, 519 F.3d 909 (9th Cir. 2008)....................................45, 46

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)...........................44

*United States v. Quach*, 302 F.3d 1096 (9th Cir. 2002) ...........................................46

*United States v. Reyes*, 313 F.3d 1152 (9th Cir. 2002)............................................46

*United States v. Rogers*, 119 F.3d 1377 (9th Cir. 1997)..........................................58

*United States v. Sears, Roebuck & Co.*, 785 F.2d 777 (9th Cir. 1986) ..................56

*United States v. Texas Educ. Agency*, 600 F.2d 518 (5th Cir. 1979).......................40

*United States v. Wolfson*, 634 F.2d 1217 (9th Cir. 1980)..................................43, 49

*Women Prisoners of Dist. of Columbia Dep't of Corr. v.
    District of Columbia*, 93 F.3d 910 (D.C. Cir. 1996)...........................................38

## Statutes and Court Rules

28 U.S.C. § 455..............................................................................................21, 58

28 U.S.C. § 455(a) ..........................................................................................45, 55

28 U.S.C. § 455(b) ................................................................................................45

28 U.S.C. § 455(b)(5)(iii) ......................................................................................54

28 U.S.C. § 455(e) ...........................................................................................24, 56

28 U.S.C. § 1291 .....................................................................................................3

28 U.S.C. § 1292(a)(1) ............................................................................................3

28 U.S.C. § 1331 .....................................................................................................3

28 U.S.C. § 1343 .....................................................................................................3

28 U.S.C. § 1367 .....................................................................................................3

28 U.S.C. § 2106 ......................................................................................26, 44, 56

FED. R. APP. P. 4(a)(1)(B) ......................................................................................3

## Other

Cindy Carcamo, *Recall Effort Against Arizona's Sheriff Joe Arpaio Fails*, L.A.
    TIMES (May 30, 2013), https://goo.gl/AL3qgu.....................................................9

JUDICIAL CONFERENCE OF THE UNITED STATES, COMMITTEE ON CODES OF
    CONDUCT, Advisory Op. No. 58 (June 2009).....................................................54

Memorandum from The Attorney General to All Department Employees
    (Mar. 9, 2012) .......................................................................................................8

**INTRODUCTION**

The orders under review must be vacated and the case re-assigned to a different judge on remand for two fundamental reasons.

*First*, the district court has ignored this Court's unambiguous mandate limiting the injunction in this case to relief that is narrowly tailored to redress the underlying constitutional violation. This Court squarely held that the court below may *not* regulate Maricopa County Sheriff's Office (MCSO) "internal investigations … [that] ha[ve] no bearing on the constitutional rights at stake here." *Melendres v. Arpaio*, 784 F.3d 1254, 1267 (9th Cir. 2015) (*Melendres II*). Nevertheless, the district court has reinstated "[t]he Monitor's authority," vacated in *Melendres II*, "to inquire and report on all MCSO Internal Affairs investigations and not those merely that are related to Class Remedial Matters." ER52.[1] The court below has issued detailed regulations governing all aspects of Internal Affairs operations, policies, procedures, and personnel that now "apply to *all* misconduct investigations of MCSO personnel," ER19 (emphasis added), and has directed his judicial officers to themselves conduct and adjudicate internal investigations despite several binding decisions prohibiting judicial officers from directly administering governmental operations. Finally, the court has re-opened closed internal

---

[1] "ER" refers to Appellants' Excerpts of Record. "Doc." refers to a docket entry in the district court, No. 07-cv-2513 (D. Ariz.).

investigations of MCSO officers for the stated purpose of punishing them, and it has ordered its Monitor to investigate and impose discipline (up to and including demotion, suspension, and termination) against these law enforcement officials, even though federal courts may not use their remedial power to punish or terminate state officials.

*Second*, this case must be reassigned to a new district judge because the current judge and his Monitor have repeatedly engaged in *ex parte* communications concerning the merits of issues before the court, even though the court prohibited such communications when it appointed the Monitor. Many of these *ex parte* communications were effectively between the judge and *parties to the case*, for they involved the Monitor privately reporting to the judge information that the Monitor learned through his authorized *ex parte* communications with the parties. In these circumstances, the purely prospective relief of reassignment of the case to a new judge is mandatory. *See, e.g.*, *Edgar v. K.L.*, 93 F.3d 256, 262 (7th Cir. 1996); *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 318 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036, 1043–44 (D.C. Cir. 2004). These improper *ex parte* communications compel reassignment, especially when coupled with additional evidence in the record of actual and apparent bias, including credible reports, not denied by the Judge, that his wife stated that the Judge "hates" Sheriff Joseph Arpaio and "will do anything to get

[him] out of office," ER240, and the Judge's admitted failure to disclose that his brother-in-law is an equity partner in the law firm representing Plaintiffs.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. The court entered a final order (the Contempt Injunction) imposing sanctions for civil contempt and entering additional injunctive relief on July 26, 2016. ER1. Appellants timely noticed this appeal on September 15, 2016. ER270; FED. R. APP. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1292(a)(1).

## STATEMENT OF ISSUES

1.  Whether the Contempt Injunction exceeds bedrock limitations on a federal court's equitable and civil contempt authority.

2.  Whether the case must be reassigned to a different district judge and monitor, and the Contempt Findings and Contempt Injunction must be vacated.

## STATEMENT OF THE CASE[2]

The plaintiff class of Latino individuals brought this action in 2007, alleging that officers violated the Fourth and Fourteenth Amendments by profiling them and subjecting them to illegal stops while enforcing immigration laws. The district court entered a preliminary injunction in 2011, prohibiting Defendants[3] from detaining

---

[2] A Statutory Addendum is included at the end of this brief.
[3] "Defendants" refers to Arpaio and Maricopa County. "Appellants" refers to Arpaio, Chief Deputy Gerard Sheridan, and Lieutenant Joseph Sousa.

3

any individual "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." *Melendres v. Arpaio*, 695 F.3d 990, 994 (9th Cir. 2012) (affirming preliminary injunction). Following a bench trial on the merits, the district court entered permanent injunctive relief in May 2013. ER889.

## A.   The Monitor Authority Order and This Court's Partial Vacatur.

In October 2013, the district court entered a supplemental injunction (the Monitor Authority Order) directing MCSO to amend its policies, training, and practices governing the enforcement of immigration laws, and requiring the appointment of a Monitor to oversee enforcement of the court's injunctions. ER669. Two aspects of the Monitor Authority Order are relevant to this appeal.

*First*, the Order authorized the Monitor to communicate *ex parte* with the parties but *not* with the court itself. ER718. Plaintiffs had proposed that the Monitor "be permitted to have ex parte communications with the Parties *and the District Court*." ER743 (emphasis added). Defendants objected, arguing that the Monitor should "be permitted to have ex parte communications with the Parties" only. ER738. The court sustained Defendants' objection, promising to "let [Defendants] stand in on any of the communications" between it and the Monitor. ER732–33 (interruptions omitted).

4

*Second*, the Monitor Authority Order authorized the Monitor, in evaluating compliance with the court's orders, to consider factors unrelated to the constitutional violations at issue in this case. Specifically, the court authorized the Monitor to consider the "disciplinary outcomes for any violations of departmental policy" as well as "whether any Deputies are the subject of repeated misconduct Complaints, civil suits, or criminal charges, including for off-duty conduct." ER721.

This Court affirmed in part and vacated and remanded in part. *Melendres II*, 784 F.3d at 1267. The Court vacated the provisions of the Monitor Authority Order granting the Monitor sweeping authority to consider violations of *any* departmental policy, and civil suits or criminal charges brought for *any* reason whatsoever. The Court held that the Monitor's authority must be "narrowly tailored to remedying the specific constitutional violations at issue" in this case. *Id*. It concluded that the district court improperly allowed the Monitor to consider violations with "no bearing on the constitutional rights at stake here," including investigations or charges that might arise "if an officer commits spousal abuse, or clocks in late to work, or faces a charge of driving under the influence of alcohol in another state while on vacation …." *Id.*

B.    <u>**The Order To Show Cause.**</u>

In May 2014, former MCSO Deputy Armendariz committed suicide. ER180. A search of Armendariz's home turned up video clips of MCSO traffic stops and

5

personal items that were confiscated during searches. ER107, ER116. Defendants promptly brought the matter to the district court's attention, and MCSO and the Monitor commenced an investigation.

Nine months later, in February 2015, the district court issued an Order to Show Cause why several MCSO officials should not be held in contempt based on the Armendariz matter and other issues that had come to light during the ensuing investigation. ER570. The Order to Show Cause identified three grounds for possible contempt: (i) violation of the 2011 preliminary injunction, ER578–86; (ii) failure to fully comply with Plaintiffs' pre-trial discovery requests relating to the recording of traffic stops, ER587–90; and (iii) violation of the court's instructions at a May 14, 2014 status conference regarding how to collect video recordings from MCSO personnel, ER590–94.[4]

In the Order to Show Cause, the court expressly left open the potential for a criminal contempt referral of the named officers if the court concluded that the civil contempt remedies were inadequate. ER577–78. In an effort to forestall a criminal contempt referral, the MCSO, Arpaio, and Sheridan submitted a motion stating that

---

[4] At the May 14 status conference, the Court instructed MCSO officials to work with the Monitor to quietly collect any outstanding video recordings. Later that day, Sheridan instructed Deputy Chief Trombi to email commanders directing them to gather any video recordings from their personnel. Sheridan then met with the Monitor to develop a retrieval strategy, but he did not inform the Monitor at that meeting that he had already directed Trombi to email MCSO commanders. ER107–110.

they would consent to a finding of civil contempt against them, stipulate to the facts stated in the Order to Show Cause and certain other facts related to non-compliance with court orders, and agree to remedial measures "designed to address the court's directives" concerning the need for a "punitive element." Doc. 948 at 4 n.2. Among the proposed remedies, Arpaio and Sheridan agreed to personally make a cash payment of $100,000 to a civil rights organization. *Id.*, Ex. B, ¶ 2(d). They requested that the court vacate the upcoming evidentiary hearing, asserting that their proposed admissions obviated the need for further civil or criminal contempt proceedings. *Id.* at 1–2.

Nevertheless, the district court refused to vacate the evidentiary hearing. Judge Snow stated that he wanted the proposed $100,000 donation "coming out of [Arpaio's] pocket and I don't want it coming out of the Sheriff Joe Arpaio Legal Fund or any other fund from whom he has solicited." ER560. When counsel stated that Arpaio's annual salary was about $102,000 before taxes, Judge Snow emphasized that he was "interested in *sending a message to the sheriff*, and to Chief Deputy Sheridan, and/or anybody else, potentially, that comes from them having a little *skin in the game*, and I don't know that they've had skin in the game yet." ER562 (emphases added).

C.      **The Contempt Findings, Contempt Injunction, and Criminal Referral.**

Having rejected the offer to consent to civil contempt and the facts stated in the Order to Show Cause, Judge Snow conducted a 21-day contempt evidentiary hearing beginning in April 2015 and concluding in November 2015. The court did not issue its Contempt Findings until May 13, 2016, more than a full year after Arpaio and Sheridan offered to consent to contempt, *see* ER68, and it did not issue the Contempt Injunction until July 2016, *see* ER1. On August 19, 2016—only eleven days before the Arpaio stood for re-election in the Republican primary for Sheriff of Maricopa County—Judge Snow referred Arpaio, Sheridan and two other individuals to another judge for prosecution for criminal contempt. ER273. Arpaio prevailed in the August primary. Notwithstanding the longstanding policy prohibiting action by the Department of Justice that may affect the outcome of an election, *see* Memorandum from The Attorney General to All Department Employees (Mar. 9, 2012), https://goo.gl/VAiA5X, the United States announced, on October 11, the day before early voting in Maricopa County began, that it would prosecute Arpaio. *See* Order to Show Cause, *United States v. Arpaio*, No. 16-cr-1012 (D. Ariz. Oct. 25, 2016), Doc. 36. Arpaio was defeated for re-election as Sheriff in November.[5]

---

[5] After the 2012 trial on the merits, the district court issued its post-trial findings of fact on May 24, 2013, only one week before the close of an effort to force a recall vote of Arpaio. That effort "gained momentum after [the court] ruled [the previous] Friday that the immigration enforcement policies employed by Arpaio

In the Contempt Findings, the district court held Arpaio, Sheridan, Sousa, and Sands in civil contempt on one or more of the three grounds identified in the Order to Show Cause:

- The court cited all four officers for failing to implement the December 2011 preliminary injunction. The court concluded that, after the injunction was entered, MCSO failed to alter the way it enforced the immigration laws, and that "MCSO continued these unconstitutional practices until this Court entered its Findings of Fact and Conclusions of Law in May 2013." ER72.

- The court cited Arpaio for Defendants' failure to produce evidence in response to Plaintiffs' discovery requests and court orders. ER100–01.

- The court cited Arpaio and Sheridan for violating the court's oral instructions to quietly recover video recordings from MCSO personnel. ER110. The court found that Trombi's email to commanders instructing them to gather and preserve the videos led to the destruction of some videos by rogue officers. ER112.

After making these findings concerning the three issues noticed in the Order to Show Cause, the court entered an additional 84 pages of findings about MCSO's Internal Affairs investigations, even though that issue was not identified in the Order to Show Cause. The court criticized and purported to invalidate numerous MCSO Internal Affairs investigations of officers because they did not result in punishments that the court believed to be adequate. ER138–221. The court found inadequate and "invalid" MCSO's Internal Affairs investigation into the failure to implement the

---

violated the Constitution," but it narrowly failed to gather the necessary signatures by the May 30 deadline. Cindy Carcamo, *Recall Effort Against Arizona's Sheriff Joe Arpaio Fails*, L.A. Times (May 30, 2013), https://goo.gl/AL3qgu.

preliminary injunction prior to May 2013 because, in the court's view, "[d]iscipline should have been imposed," but "no internal discipline has resulted." ER149, 150, 152. The court likewise deemed "invalid" the Internal Affairs investigations into supervisory failures with respect to Armendariz because they "resulted, with a single exception, in the imposition of no discipline on anyone at the MCSO …." ER166. The district court criticized several other investigations for the same reason—in each case, the court believed that the MCSO officer involved should have received more severe discipline. ER168–213. The court also concluded that Internal Affairs had structural problems including inadequate training and conflict-of-interest policies. ER213–221.

Finally, the court made findings about potential remedies. Most importantly, the court concluded that because "Plaintiffs do not assert that Defendants remain in violation of the Court's preliminary injunction," there is "no need to use the Court's contempt power to coerce Defendants to comply with the preliminary injunction." ER222. The court found that "the Defendants are no longer detaining members of the Plaintiff class without authorization," but they were "manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class." ER224. At the end of its Contempt Findings order, the court announced its intention to impose the remedies challenged here. ER222–28.

Appellants, citing among other authorities this Court's decision in *Melendres II*, objected that any remedies "must be limited to the constitutional violations it has found in this case and the interests of the Plaintiff class" and that the "court's exercise of its contempt authority should be tempered by the principle that the least possible power adequate to achieve the end proposed should be used in contempt cases." Doc. 1687 at 7 n.3, 10 n.5. However, at a hearing four days later, the court made clear that it would enter the relief that it did ultimately enter, and that any further objection would be futile. *See, e.g.*, ER376 ("I fully intend to grant to my monitor the authority to monitor all MCSO IA internal investigations"); ER369–70 ("I don't have confidence any more in the direction of the Maricopa County Sheriff's Office," including in "their operation of their own Internal Affairs Division," and thus concluding that "I do think it may be appropriate for an independent authority to conduct some of the investigations"). The court invited the parties to brief the details of the court's takeover of Internal Affairs, but the court ruled that it "will not permit Defendant Arpaio to raise substantive challenges to the Court's Findings of Fact." ER381. Appellants' subsequent briefing reiterated Appellants' objections to relief that transgressed the limits announced in *Melendres II* and preserved all challenges to the Findings. Doc. 1715 at 9–11, 18, 19 n.15; Doc. 1729 at 10 n.8; *see also* Doc. 1687 at 7 n.3, 10 n.5, 11 n.6.

Appellants submitted briefing on the details of the court's Internal Affairs remedies on the understanding, expressly acknowledged by the district court, that Appellants had reserved their objections to the court's expansive exercise of remedial and contempt power. Appellants stressed that their proposals were an "attempt[ ] to … offer what we feel is an appropriate civil remedy for the Court" given the court's decision to take control of Internal Affairs from MCSO, but these proposals were subject to the "various objections" they had previously made to the court's exercise of such sweeping powers. ER346. The court agreed that "the positions that you proposed [are] a reasonable middle ground for appeal, you're not waiving any rights—you don't intend to waive any rights to appeal on." ER346; *see also* ER337 ("[E]ven though you've participated [in negotiations over the Contempt Injunction], I think there's very few areas in which I think you've surrendered any right to appeal."); ER354–55, ER359–62 (court acknowledging Appellants' "federalism" objections).

On July 26, 2016, the court entered the Contempt Injunction, ER1, three aspects of which are relevant to this appeal.

*First*, the Contempt Injunction mandated sweeping reforms to MCSO's Internal Affairs operations and procedures, and required that the reforms "shall apply to all misconduct investigations of MCSO personnel," regardless of whether those investigations concern the constitutional violations at issue in this case. ER19. These

12

reforms governed every aspect of every internal investigation, including who may conduct the investigations, ER25–27, ER31–32, ER36–38, the conflict-of-interest rules, ER19–20, the standard of proof, ER30–31, permissible dispositions for investigations, ER30–31, and the components of every final report, ER29–30. The court even ordered that the Professional Standards Bureau move to a new building "separate from other MCSO facilities" that must have a "non-intimidating atmosphere." ER27. The court also ordered that MCSO's complaint forms may not warn about the potential criminal consequences for filing false complaints, even if such consequences exist. ER40.

*Second*, the court stripped MCSO of control over Internal Affairs investigations related to the constitutional violations in this case, and it vested the Monitor with plenary control over most of those investigations. ER49–50. (Plenary control over the rest of those investigations was vested in the court's independent disciplinary authority. *See infra*.) The court granted the Monitor plenary authority to "direct and/or approve all aspects of the intake and investigation of Class Remedial Matters," including the power to use his own personnel to conduct investigations, to determine fault, and to impose discipline. ER49. The Monitor has the power to "vacate[ ]" or "overrid[e]" the Sheriff's decisions with respect to these investigations, and the Sheriff and MCSO are obligated to "expeditiously implement

the Monitor's directions, investigations, hearings, and disciplinary decisions."
ER51.

*Third*, the district court ordered the re-opening of at least a dozen closed
Internal Affairs investigations relating to MCSO's failure to implement the
preliminary injunction prior to May 2013 and its failure to comply with its discovery
obligations. The court required that a court-appointed investigator conduct the re-
opened investigations and any other new investigations that the Monitor decides are
warranted based on the court's Findings of Fact, and that a disciplinary authority,
also appointed by the court, determine any punishment for any violations found by
the court-appointed investigator. ER54–66.

## D. Judge Snow and the Monitor's Extensive *Ex Parte* Communications About the Merits of the Case.

Before and during the litigation of the civil contempt charges, the Monitor's
office had extensive *ex parte* communications with Defendants and MCSO officials,
as authorized by the Monitor Authority Order. But the Monitor *also* engaged in
extensive—yet unauthorized—*ex parte* communications about the merits of the case
with *Judge Snow*. Notwithstanding the court's acquiescence to Defendants'
objection to such communications at the time the Monitor Authority Order was
entered in 2013, and its statement at the time that Defendants would be permitted to
"stand in on any of the communications" between the Monitor and the court, ER732–
33 (interruptions omitted), Judge Snow subsequently admitted that "the Monitor is

in constant communication with the Court regarding the performance of his services," ER629.

These private conversations have concerned numerous issues that were later the subject of the Contempt Findings, the Contempt Injunction, and the criminal contempt referral. The record documents at least nine different topics of merits-related *ex parte* conversations between Judge Snow and the Monitor.

1. **The MCSO's decision to close certain criminal investigations.** Judge Snow and the Monitor discussed *ex parte* MCSO's decision to close criminal investigations arising out of the Armendariz matter. ER613. Judge Snow stated that "what Monitor Warshaw told me about the substance and quality of that investigation concerned me considerably." ER613. The court directed the Monitor to prepare a report concerning the adequacy of MCSO's investigation into the Armendariz issue, and Judge Snow and the Monitor apparently discussed the content of that report during the drafting process. ER613–14. These *ex parte* conversations related directly to the later contempt finding that MCSO's decision to close these criminal investigations was plagued by "considerable deficiencies." ER173. The finding was based in part on the report that Judge Snow had discussed *ex parte* with the Monitor. ER181–82. And based in part on that finding, the court re-opened a closed Internal Affairs investigation. ER54.

2. **The adequacy of MCSO's internal investigations.** The Monitor and

15

the district court engaged in an *ex parte* conversation that led the court to conclude that MCSO's Internal Affairs investigations were hampered by a conflict of interest. Judge Snow stated that "based on my conversations with [the Monitor]," "it is my understanding that [MCSO's independent internal investigator] has been directed by the MCSO that he is to provide facts only and is not to evaluate those facts." ER557. Judge Snow concluded that these facts, apparently reported to him *ex parte* by the Monitor, are "pretty concerning," and that "there's an inherent conflict there, especially if [the investigator] can't come to his own conclusions or make any recommendations." ER551. This *ex parte* conversation related directly to the later contempt findings that MCSO's Internal Affairs investigations were hobbled by a conflict of interest and its suggestion that the investigator himself had a conflict. ER141, 145. The court invalidated the completed Internal Affairs investigations based on these findings and re-wrote MCSO's conflict-of-interest policy to address the concerns that the Monitor had drawn to Judge Snow's attention *ex parte*. ER19–20, ER54.

      **3.**    **The Dennis Montgomery investigation.** At the contempt evidentiary hearing, the district court directed MCSO to produce documents it had received from a confidential informant named Dennis Montgomery, and Judge Snow then discussed *ex parte* with the Monitor the documents that were produced. After "[t]he monitor started to review" those documents, Judge Snow stated that the Monitor

16

"gave me a couple of concerns that, frankly, I hadn't been aware of …." ER511. The Monitor privately evaluated the relevance of those documents for the court, and based on that *ex parte* conversation, Judge Snow concluded that the documents had a "tendency to suggest that previous testimony offered in this matter may have been untruthful." ER498. These *ex parte* conversations related to the later contempt finding that these documents "demonstrate[ ] Sheriff Arpaio's many intentional misstatements under oath." ER133. The district court found Arpaio in contempt based in part on these findings.

4.      **Trombi's May 14, 2014 email.** Judge Snow first learned about Trombi's May 14, 2014 email, attempting to gather the documents Judge Snow had order MCSO to quietly collect, through an *ex parte* communication with the Monitor. ER646. Based on the Monitor's *ex parte* report, Judge Snow concluded that Chief Trombi's actions had the effect of "frustrating the plan that had been arrived at by Chief Deputy Sheridan and the monitor." ER646. This *ex parte* communication related to the later contempt finding that "[a]s a result of Chief Trombi's email … the approach agreed upon between the MCSO and the Monitor was not possible." ER109. Trombi's email provided one of the three grounds on which the court found Arpaio and Sheridan in contempt. ER110.

5.      **The credibility and good faith of witnesses.** Judge Snow and the Monitor have engaged in *ex parte* conversations regarding MCSO officials'

credibility. In one conversation, the Monitor discussed *ex parte* Arpaio's alleged statement to the Monitor that Arpaio "loves to have confrontations with the federal court because every time he does his popularity goes up." ER607. In other conversations, Judge Snow and the Monitor discussed *ex parte* the credibility of defense counsel, ER617–18, MCSO's independent investigator, ER551, and an MCSO law enforcement official, ER395. The court even regulated the presentation of testimony at the evidentiary hearing based on the credibility determinations Judge Snow had discussed privately with the Monitor. ER395. Although some of these comments about credibility were favorable, it is reasonable to assume that the Monitor *also* spoke unfavorably about other officials' credibility and "efforts to comply" with court orders. *See* ER395.

**6.      Compliance with court orders regarding internal investigations and document production.** Judge Snow and the Monitor engaged in ongoing *ex parte* communications about the status and adequacy of MCSO's internal investigations. At one hearing, Judge Snow stated that the Monitor had reported that Defendants "may not be in technical compliance with [a] court order" regarding the status of ongoing Internal Affairs investigations. ER568. On another occasion, Judge Snow disclosed that the Monitor told him *ex parte* that Defendants were not adequately apprising the Monitor about the status of ongoing obligations. ER540– 41. Judge Snow and the Monitor have also engaged in regular, continuous

communication regarding the adequacy of Defendants' document production. *See, e.g.*, ER402, ER387. The Contempt Findings cited Appellants for misconduct in connection with the quality of MCSO's document production and internal investigations. *See*, *e.g.*, ER100, ER138, ER107, ER111.

7. **The Armendariz investigation.** Judge Snow and the Monitor engaged in *ex parte* conversations concerning the investigation into the Armendariz matter. Judge Snow first learned about Armendariz's suicide through *ex parte* conversations with the Monitor. ER643–44. The Judge also admitted to *ex parte* conversations with the Monitor about Armendariz's use of a dash camera, ER659, and about MCSO's policies concerning the self-recording of traffic stops, ER662. MCSO's policies with respect to the recording of traffic stops were central issues in the contempt proceeding and provided much of the basis for the Contempt Findings and Contempt Injunction. *See, e.g.*, ER107, ER110.

8. **The need to expand the Monitor's authority.** Before the court expanded the Monitor's authority in the Contempt Injunction, Judge Snow and the Monitor discussed *ex parte* the Monitor's "concerns about MCSO operations" that "didn't fall within the scope of our order." ER654.

9. **Sources of MCSO funding.** During the contempt hearing, Judge Snow *sua sponte* questioned Arpaio about his relationship with Montgomery (the confidential informant), even though that relationship was neither related to the

constitutional violations in this case nor to any issue raised in the Order to Show Cause. Although Arpaio testified that MCSO had concluded that the information Montgomery had supplied was "junk," ER525, Judge Snow asked Arpaio which organizations had paid Montgomery for his services and had reimbursed travel expenses related to that investigation, ER520–21. As Judge Snow later admitted, during the ensuing lunch break he had an *ex parte* conversation with the Monitor in which "the Monitor mentioned to the Court that the Cold Case Posse [a group that participated in the Montgomery investigation] may have separate finances from MCSO." ER249. After the lunch break, Judge Snow resumed questioning of Arpaio, stating, "I was told over lunch that … you also have various sources of funding within the MCSO, like the Cold Case posse has its own funds. Is that possible?" ER532–33. Arpaio responded that MCSO does not control Posse funds. ER533.

*     *     *

As discussed earlier, Defendants objected to permitting *ex parte* communications between the court and the Monitor prior to entry of the Monitor Authority Order. ER732–33. Defendants renewed their objection at a hearing on August 11, 2015. ER409. Despite its earlier agreement to permit Defendants to be present for any communications with the Monitor, the court overruled the objection, asserting that the *ex parte* conversations were necessary for the court "to supervise the monitor in his work." ER410. The court twice emphasized that Defendants had

preserved their objection, stating: "And so you've preserved the issue to the extent that you believe it is a problem," and then adding once again, "you have preserved it for the record." ER410.[6]

### E.    The May 2015 Recusal Motion.

During the evidentiary hearing on the contempt charges, Arpaio and Sheridan moved for recusal of Judge Snow. They cited three grounds for recusal, among others, that are relevant to this appeal.

*First*, Arpaio and Sheridan relied on the fact that during the evidentiary hearing, Judge Snow questioned Arpaio about whether the Judge or his family had "ever been investigated by anyone." ER522. At the hearing and in a later written submission, Arpaio responded that in August 2013, he had received a Facebook message from a woman named Karen Grissom alleging that Judge Snow's wife had approached her at a restaurant in 2012 and had told her that Judge Snow "hates" Arpaio and "will do anything to get [him] out of office." ER240; *see also* ER522–23, ER529–30; Doc. 1083.

---

[6] In November 2016, Appellants requested that Judge Snow recuse himself on a going-forward basis because he had engaged in the *ex parte* communications just discussed, and Appellants sought discovery of the substance of the *ex parte* communications between the district court and the Monitor. Docs. 1878, 1884, 1885. The parties are currently briefing those motions. As discussed *infra*, this Court may consider these *ex parte* communications for the first time on appeal both under 28 U.S.C. § 455 and in deciding whether to exercise its reassignment power.

Arpaio's counsel hired a private investigator to evaluate the credibility of Grissom's account, and the investigator concluded that Grissom and her husband (who was also present at the restaurant and confirmed Grissom's account) were "sincere and truthful in their statements about what they believe they heard from Mrs. Snow." ER477; *see also* ER423–25; ER456–59 (transcripts of interviews of Karen and Dale Grissom). In an interview with Arpaio's counsel, Grissom was likewise "adamant that she was telling the truth about what the judge's wife had said to her" and "expressed no fear or reservation about telling the truth." ER480. Nevertheless, Defendants' then-counsel advised Defendants in 2013 that he believed the Grissom information was so "fundamentally flawed" that it would be unethical for any lawyer to raise the matter, ER489, and counsel threatened to withdraw from the representation if Defendants pursued recusal.[7] Counsel did not explain how his conclusion could be squared with the investigator's finding that the Grissoms were credible. But given their counsel's position, Defendants did not to move to recuse Judge Snow in 2013.

*Second*, Arpaio and Sheridan argued that Judge Snow should be recused based on his *ex parte* conversation with the Monitor during a lunch break of the evidentiary

---

[7] The district court ordered Defendants to produce a redacted letter from their then-counsel setting forth his advice on the issues raised by Grissom's disclosure, based on the court's conclusion that Sheridan had waived the privilege by referencing the letter to the press. ER473.

hearing, in which the Monitor and the court privately discussed the sources of MCSO funding for investigations. *See supra* Part D.9.

*Third*, Arpaio and Sheridan argued Judge Snow should be recused because the Judge's brother-in-law was an equity partner in the law firm representing Plaintiffs. That conflict arose in 2010 when the law firm of Covington & Burling was substituted as counsel for Plaintiffs. ER922. Unbeknownst to Defendants at the time, Judge Snow's brother-in-law was then and remains today an equity partner at Covington. Judge Snow knew that his brother-in-law was a Covington partner and understood that this relationship raised a serious recusal issue. Nevertheless, he chose not to inform the parties of the conflict. Instead, he privately decided to remain on the case and keep the conflict confidential. *See* ER920.

During the next two years, Judge Snow decided motions in Plaintiffs' favor, and the parties engaged in costly and time-consuming discovery and trial preparation. On June 8, 2011, the district court awarded $92,705 in attorneys' fees and costs to Covington. ER921.[8] On June 14, 2012—one month before trial was to begin—Plaintiffs' counsel informed the court and Defendants that Judge Snow's brother-in-law was a partner at Covington, but argued that the conflict did not require recusal because the brother-in-law would not participate in the case or share in any

---

[8] In 2014, the Court awarded an additional $3,454,074.96 to Covington. ER626. Covington's request for another $3,482,387.18 in 2016 was settled. Docs. 1755, 1832.

fees from it. Judge Snow then entered an order admitting that he had known about the conflict for over two years and conceding that "it would have been the better course to notify the parties at the time of the substitution of the Covington Attorneys." ER920.

Defendants' counsel urged Judge Snow to remain on the case despite the conflict, explaining that Defendants wanted "closure" and a speedy resolution of the case because "there's a tremendous stigma associated with the issues in this case for my client …." ER909–10. At Judge Snow's request, Defendants filed a notice "waiv[ing] any and all appeal issues regarding only the Court's potential bias, impartiality, and/or conflict of interest" as it related to the Judge's brother-in-law. ER901. The court then entered an order stating that the Judge would remain on the case. ER891. Notwithstanding the 2012 waiver of the conflict, Arpaio and Sheridan invoked it in support of their 2015 recusal motion because Congress has expressly provided that such conflicts may not be waived, s*ee* 28 U.S.C. § 455(e), and because non-party contemnor Sheridan had not been a litigant in the case in 2012 (and thus could not be bound by the waiver).

Judge Snow denied the recusal motion. First, he rejected as untimely the argument that his wife's alleged statements to Grissom supported recusal. ER261–62. Notably, Judge Snow neither confirmed nor denied that his wife had in fact told Grissom that he hated Arpaio and wanted him ousted from office. Nor did Judge

Snow state whether his wife's reported description of his state of mind was accurate. Instead, he concluded that disqualification was not required because Arpaio's former counsel had determined that the conversation was not sufficient grounds for recusal. ER262. Second, Judge Snow stated that his *ex parte* communication with the Monitor did not provide grounds for recusal because the out-of-court statements were "gained in a judicial capacity" and his conversation with the Monitor was not entered into the record. ER249. Finally, after inaccurately suggesting that in 2012 he himself had "raised the issue of whether [his] withdrawal was appropriate in light of [his] brother-in-law's partnership interest at Covington," ER264—in fact, the relationship only came to light when Covington disclosed it—Judge Snow held that recusal was not required under governing ethics rules, and that Arpaio and Sheridan had forfeited the argument because Arpaio waived it in 2012, ER263–66.[9]

## STANDARD OF REVIEW

Orders imposing injunctive relief and/or contempt sanctions are reviewed for abuse of discretion, *Toussaint v. McCarthy*, 801 F.2d 1080, 1087–89 (9th Cir. 1986), as are orders denying a recusal motion, *In re Marshall*, 721 F.3d 1032, 1039 (9th

---

[9] Arpaio and Sheridan petitioned for a writ of mandamus directing Judge Snow's disqualification, but this Court denied the petition, holding that "Petitioners have not demonstrated that this case warrants the intervention of this court by means of the extraordinary remedy of mandamus." Order at 2, *In re Arpaio*, No. 15-72440 (9th Cir. Sept. 15, 2015), Doc. 14.

Cir. 2013). An error of law is an abuse of discretion, and legal conclusions are reviewed *de novo*. *Id.*

A party who has not raised a ground for recusal below "will bear a greater burden on appeal." *Noli v. Comm'r*, 860 F.2d 1521, 1527 (9th Cir. 1988). This Court may consider reassignment under 28 U.S.C. § 2106 in the first instance on appeal, and the Court will review the question *de novo*. *California v. Montrose Chem. Corp. of California*, 104 F.3d 1507, 1521 (9th Cir. 1997).

## SUMMARY OF ARGUMENT

1.       The Contempt Injunction flouts this Court's decision in *Melendres II* and departs dramatically from well-established limits on federal court remedial authority. This Court held that the district court may not authorize the Monitor to review "internal investigations … [that] ha[ve] no bearing on the constitutional rights at stake here," 784 F.3d at 1267, yet the court below has once again "extend[ed] the Monitor's authority to inquire and report on all MCSO Internal Affairs investigations and not those merely that are related to Class Remedial Matters," ER52. The court went further still, regulating "*all* misconduct investigations of MCSO personnel," ER19 (emphasis added), notwithstanding this Court's holding that such relief is not "narrowly tailored to remedying the specific constitutional violations at issue," *Melendres II*, 784 F.3d at 1267.

This Court has repeatedly held that a court-appointed monitor may not exercise direct control over government operations. *See, e.g.*, *Toussaint*, 801 F.2d at 1102–06[10] (vacating an institutional-reform injunction authorizing a monitor to decide whether state prisoners must remain in administrative segregation); *National Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 545 (9th Cir. 1987) ("*NORML*") (monitor "may not be placed in *control* of governmental defendants for the purpose of forcing them to comply with court orders"). Nevertheless, the district court has given the Monitor nearly total control over Internal Affairs operations, procedures, personnel, and investigations. The court has granted the Monitor the power to commence and adjudicate internal investigations, impose discipline, vacate and override the Sheriff's decisions, and direct the Sheriff and all other MCSO officials to "implement the Monitor's directions." ER51. In addition, the court has re-opened closed Internal Affairs investigations to punish MCSO officers, ER54–55, even though punishment is not a valid purpose for exercise of the court's equitable remedial or civil contempt powers, *Milliken v. Bradley*, 433 U.S. 267, 288 (1977) (equitable remedy may be upheld only if "the remedy is indeed remedial[ ] [and] [t]he order does not punish anyone").

The district court imposed these extraordinarily intrusive additional Internal Affairs remedies even though it has admitted that there was no need to coerce

---

[10] *Abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

compliance with its earlier injunction prohibiting Defendants' unconstitutional practices because there is no claim that these practices continued after May 2013, ER72, ER222, and even though it found that "the Defendants are no longer detaining members of the Plaintiff class without authorization," ER224.

      2.    Judge Snow and his monitor have engaged in unauthorized *ex parte* communications about the merits. And many of these *ex parte* communications were effectively between the district judge and *parties to the case*, for they involved the Monitor privately reporting to the judge information that the Monitor learned in *ex parte* communications with the parties. When a judge has had *ex parte* communications concerning the merits of a case with a judicial officer, neither the judge nor the judicial officer may continue to participate in the case. *See, e.g.*, *Edgar v. K.L.*, 93 F.3d 256, 262 (7th Cir. 1996); *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 318 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036, 1043–44 (D.C. Cir. 2004). These communications thus require reassignment standing alone, and all the more so when viewed alongside the cumulative evidence that Judge Snow "hated" Arpaio and sought to drive him from office, as well as the additional conflict involving Judge Snow's brother-in-law.

**ARGUMENT**

## I. The Contempt Injunction Violates Well-Established Limits on Federal Judicial Authority.

The district court based the Contempt Injunction on both its equitable power to remedy the underlying violation of Plaintiffs' constitutional rights and its civil contempt power. Both powers are subject to well-established limits. *First*, this Court has "long held that injunctive relief 'must be tailored to remedy the specific harm alleged.' " *Melendres II*, 784 F.3d at 1265 (citation omitted). Accordingly, "an injunction exceeds the scope of a district court's power … if it is 'aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.' " *Id*. (quoting *Milliken*, 433 U.S. at 282). Moreover, it is well-settled that an equitable remedy may be upheld only if "the remedy is indeed remedial[ ] [and] [t]he order does not punish anyone …." *Milliken*, 433 U.S. at 288.

*Second*, federal courts may impose civil contempt remedies solely for the purposes of "coerc[ing] the defendant into compliance with the court's order, or … compensat[ing] the complainant for losses sustained." *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829 (1994). Punitive remedies may only be imposed in a criminal contempt proceeding that satisfies due process. *Id*. at 826. Where "the purpose of the relief … [is] to punish defiance of the court's order rather than to remedy [the wrong] or compensate" the wronged party, or to coerce compliance, civil contempt will not lie. *Falstaff Brewing Corp. v. Miller*

*Brewing Co.*, 702 F.2d 770, 780 (9th Cir. 1983) (holding that a contempt citation for violation of a discovery order did not sound in civil contempt because its purpose was neither to coerce obedience nor to remedy harm to another party, but rather to punish and deter).

### A. The Wholesale Regulation of Internal Affairs Flouts *Melendres II* and Exceeds the District Court's Powers.

#### 1. *The district court exceeded its power to issue equitable remedial relief.*

In *Melendres II*, this Court vacated the permanent injunction to the extent it authorized the Monitor to review whether MCSO officials had committed "*any* violations of departmental policy" and whether deputies were subject to "misconduct Complaints, civil suits, or criminal charges" for any grounds whatsoever, including even "for off-duty conduct." 784 F.3d at 1266. The Court explained that whether an "officer commits spousal abuse, or clocks in late to work, or faces a charge of driving under the influence of alcohol in another state while on vacation … has no bearing on the constitutional rights at stake here." *Id.* at 1267. In contrast, the Court held that the Monitor's authority to consider citizen complaints was "narrowly tailored to remedying the specific constitutional violations at issue" because the Monitor could *only* consider complaints about "biased policing or unlawful detentions and arrests by MCSO Patrol/Operation deputies." *Id.*

30

The injunction under review repeats and magnifies these errors. The district court reinstated the Monitor's authority to review "all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters." ER53; *see also* ER52. The court also announced a new set of policies that it decreed must "apply to *all* misconduct investigations of MCSO personnel." ER19; *see also* ER18 (emphasis added).[11]

The breadth of the order under review is astonishing. It legislates everything from the "atmosphere" of the main office of the Professional Standards Bureau, ER27, to standards of proof applicable in all internal proceedings, ER30–31, the content of final investigation reports, ER29–30, and a mandate to hire actors to file false complaints, ER44–46. The court has taken control over which personnel may transfer in and out of three separate MCSO bureaus, ER47–48, seized the power to fire the heads of those bureaus, ER47–48, and mandated numerous bureaucratic reporting requirements that apply to every single internal investigation, *see e.g.*, ER29–31, ER33, ER38, ER41–46.

---

[11] The parties' joint proposed draft of the Contempt Injunction provided that certain policies would apply to all MCSO Internal Affairs investigations. Doc. 1732–3 at 3. As discussed *supra* at pages 11–12, this joint proposal was submitted subject to Appellants' prior objection that, under *Melendres II*, the district court lacked the authority to regulate any matters unrelated to the constitutional violations in this case, and the court below expressly acknowledged that Appellants' participation in the drafting of the order was subject to and without waiving their federalism objections. *See* ER337, ER346, ER354–55, ER359–62.

31

The constitutional violations in this case are related to Defendants' defunct practice of permitting deputies to consider Latino ancestry when enforcing immigration-related laws. *Melendres II*, 784 F.3d at 1258–59. But the district court's comprehensive regulation of internal investigation operations, procedures, and personnel is not remotely limited to investigations concerning complaints about "biased policing or unlawful detentions and arrests by MCSO Patrol/Operation deputies." *Id*. at 1267. Instead, the court has once again extended its supervision to investigations having nothing to do with the constitutional violations found in this case. The court even conceded that many internal investigations that it reviewed and criticized were "*not* sufficiently related to the rights of the members of the Plaintiff class …." ER55–56 (emphasis added); *see also* ER52–53.

The district court asserted that this sweeping remedy was necessary "because absent such reforms, there is no way to determine whether policies or practices that insulated those who violated the constitutional rights of the Plaintiff class from investigation and discipline would continue to do so." ER5. But the court never explained why the narrowly-tailored remedy that this Court approved in *Melendres II* (limiting the court's supervision to investigations related to the constitutional violation) was insufficient. Indeed, the court found that Defendants' critical error was to employ a "*Melendres*-only policy" whereby "police misconduct related to members of the Plaintiff class [was] *exempted from the normal internal affairs*

*system* and is treated with special leniency or is entirely swept under the rug." ER5 (emphasis added); *see also* ER49. If the problem with the investigations related to the Plaintiff class is that they were "exempted from" MCSO's normal Internal Affairs rules, there is no reason for the court to seize control of the "normal internal affairs system" as it applies to myriad other misconduct complaints having nothing to do with the Plaintiff class.

The court below cited Defendants' "history of noncompliance with prior orders" to justify its intrusive remedy, ER4, but Defendants' compliance history provides a strong additional basis for concluding that the new Internal Affairs remedies go too far. The district court expressly found that "MCSO continued [its] unconstitutional practices" only until the court found Defendants liable following trial on the merits "*in May 2013*," ER72 (emphasis added), and that "Defendants are no longer detaining members of the Plaintiff class without authorization," ER224. Accordingly, the relevant constitutional violations had ceased by the time the court below entered the permanent injunction and adopted the injunctive remedies concerning Internal Affairs that this Court vacated in part in *Melendres II*. *A fortiori*, reinstating and substantially expanding those remedies could not possibly have been necessary to remedy the constitutional violations.

In any event, while a history of non-compliance can be relevant, it does not give the district court *carte blanche* to regulate matters unrelated to the case.

*Melendres II* made this point clear. This Court held there that although requiring data collection regarding traffic stops was "typically disfavored," Defendants' history of noncompliance justified this robust remedy. 784 F.3d at 1266. Traffic stops, of course, are intimately connected to the constitutional violations at issue here. But that same history of noncompliance did not stop this Court from invalidating the regulation of Internal Affairs investigations that are unrelated to the violations at issue here. *Id.* at 1267.

The district court also claimed that its extension of the Monitor's authority to all internal investigations was necessary because "MCSO manipulates internal affairs investigations other than those that have a direct relation to the Plaintiff class." ER52–53. But the court cannot use this case as a toehold to mandate its favored reforms to any perceived deficiencies in Internal Affairs processes unrelated to Plaintiffs' constitutional complaints. Instead, federal courts may "remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (quotation marks omitted). The wisdom of MCSO's Internal Affairs policies, procedures, and operations writ large was not before the court or noticed in the Order to Show Cause, and the court had no authority to craft remedies designed to improve that system. *Hoptowit v. Ray*, 682 F.2d 1237, 1251–52 (9th Cir. 1982) (district court in prison-conditions case exceeded its authority by issuing orders designed to eliminate racism

at the prison where "the district judge did not have any question of racism before him"). And although the district court may compel compliance with federal law by *enjoining* state laws or practices that violate federal law, it may not, as here, direct state or local officials to more vigorously *enforce* State laws in order to provide a robust deterrent against the violation of federal law. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984); *Printz v. United States*, 521 U.S. 898, 935 (1997).

The district court's regulation of all Internal Affairs operations and policies also does nothing to "restore the victims of discriminatory conduct to the position they would have occupied in the absence of" MCSO's unconstitutional conduct. *Milliken*, 433 U.S. at 280. Those victims will not be affected at all by the court's new charter for how MCSO must investigate complaints about spousal abuse or steroid use. And by completely taking over virtually *all* aspects of MCSO Internal Affairs policies, procedures, operations, and personnel, the Contempt Injunction does not respect "the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken*, 433 U.S. at 281; *see also Horne v. Flores*, 557 U.S. 433, 448–49 (2009).

### 2. *The wholesale regulation of Internal Affairs oversteps the court's civil contempt power.*

For substantially the same reasons, the comprehensive regulation of Internal Affairs cannot be sustained as a valid use of the civil contempt power. These aspects

of the district court's injunction do nothing to compensate Plaintiffs for the loss they have suffered. That objective has been fully vindicated by a separate order, which Appellants do not challenge here, establishing a regime for compensating individual class members whose constitutional rights were violated. ER305. Nor do these provisions coerce compliance with the court's orders. Indeed, the district court has already conceded that there was no need to coerce compliance because Plaintiffs have not alleged that they continued constitutional violations after May 2013, when the court issued its findings of fact and conclusions of law on the merits. ER72, ER222, ER224.

And the sweeping Internal Affairs provisions in the injunction do not impose sanctions sounding in civil contempt. This Court has held that "[a] court's power to impose coercive civil contempt depends upon the ability of the contemnor to comply with the court's coercive order" and purge the contempt. *Falstaff*, 702 F.2d at 778. But the lower court's sanction does not confine or fine (or impose any other burden) that may be purged upon compliance with the underlying permanent injunction; the order under review does not, in other words, furnish Appellants with a "key, and [they] cannot shorten the term [of contempt] by promising not to repeat the offense." *Bagwell*, 512 U.S. at 829 (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)).

**B.     The District Court Exceeded Its Authority By Granting the Monitor Direct Authority To Conduct Internal Investigations Related to Members of the Plaintiff Class.**

The district court exceeded its authority even with respect to Internal Affairs investigations relating to the constitutional violations by granting the Monitor direct authority to initiate internal investigations, appoint investigators outside MCSO to conduct them, and appoint a judge outside of MCSO to impose discipline. The court has thus taken the authority to discipline MCSO deputies from the Sheriff—an elected local government official—and granted it to the Monitor, an unelected federal judicial officer.

Specifically, the court granted the Monitor plenary authority to "direct and/or approve all aspects of the intake and investigation of Class Remedial Matters" within the Monitor's purview, including to determine which MCSO officials or members of the Monitor team should conduct each investigation, to commence civil and administrative investigations, to determine fault, and to impose discipline. ER49. Any decisions by the Sheriff or his appointees with respect to these investigations "may be vacated or overridden in whole or in part by the Monitor," and "[n]either the Sheriff nor the MCSO *has any authority*, absent further order of this Court, to countermand any directions or decision of the Monitor" with respect to these investigations. ER51 (emphasis added).

The order granting the Monitor authority to personally direct investigations, using MCSO personnel or his own team as he sees fit, and to determine fault and impose discipline against MCSO deputies, runs afoul of the black-letter law that monitors "may not be placed in *control* of governmental defendants for the purpose of forcing them to comply with court orders." *NORML*, 828 F.2d at 545 (emphasis added). In *NORML*, this Court upheld the authority granted to a monitor only because it "ha[d] not been given the power to control or administer [the defendant's] efforts" and because the court's injunction provided that " '[t]he Monitor shall not purport to direct any [of the defendant's] activities or agents, or issue orders.' " *Id.*

Similarly, in *Toussaint*, 801 F.2d at 1102–06, a decision joined by then-Judge Kennedy, this Court invalidated an order authorizing a monitor to decide which prisoners belong in administrative segregation. The Court held that the trial court "abused its discretion by allowing the Monitor to substitute his discretion for that of the defendants." *Id*. at 1106. Likewise, in *Hoptowit*, 682 F.2d at 1263, this Court upheld an order "empower[ing] the master only to monitor compliance with the court's orders," while making clear that "[a]n order placing a master in control of the prison would have been error as an overreaching of judicial authority." *See also Women Prisoners of Dist. of Columbia Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 930 (D.C. Cir. 1996) (district court abused its discretion because court-appointed officials did "not simply oversee the Department's compliance with the

Order; rather, they perform[ed] the functions of local authorities, such as the investigation of complaints of misconduct").

### C. The District Court Exceeded Its Authority by Reopening Closed Internal Affairs Investigations To Punish MCSO Personnel for Past Actions.

The district court further exceeded its authority by re-opening a dozen closed or dormant Internal Affairs investigations, identified by case number, and directing that those and potentially other investigations be re-conducted by an Independent Investigator and decided by an Independent Disciplinary Authority, each hand-picked by the court. ER54–57. The court has thus effectively commandeered state administrative processes to impose additional punishment—including possible suspension or termination—that the court itself lacks the power to impose. The court's order reopened many investigations that had been closed for more than a year and that addressed alleged conduct that took place in 2014 or earlier.

There are two fundamental errors with this aspect of the Contempt Injunction. *First*, the court has placed its own officers in control of and in direct decision-making authority over MCSO personnel. The prohibition against doing this, just discussed in Part B, *supra*, is no less firm simply because the judicial official in charge is called an "Independent Disciplinary Authority" rather than a "Monitor."

*Second*, the court's purpose in re-opening certain investigations and commencing new ones is plain: the court was dissatisfied with the results of the

Internal Affairs investigation and it wanted the MCSO officers who had been cleared by Internal Affairs to be punished. The court expressly stated that it had "made the determination that the discipline is not appropriate or adequate," and re-opened the investigations to ensure "the imposition of discipline." ER379–80. The court repeatedly emphasized its view that the original Internal Affairs investigations were improperly conducted by MCSO, allowing officials to "entirely avoid … discipline." ER2; *see also*, *e.g.*, ER6, ER10, ER66. The court stated that the investigations must be re-opened so that the court's hand-picked disciplinary officials may "decide discipline in these matters." ER54; *see also* ER227.

The court below did not have the authority to retroactively override completed state administrative proceedings in order to punish MCSO officers for past conduct. The law is settled that a federal court may not use its equitable remedial authority to punish offending parties. The Supreme Court has held that an equitable remedy may be upheld only if "the remedy is indeed remedial[ ] [and] [t]he order does not punish anyone …." *Milliken*, 433 U.S. at 288. This Court has likewise recognized that in fashioning an equitable remedy, a court's "purpose is not to punish defendants for their past failures, but to enforce compliance with current constitutional standards." *Toussaint*, 801 F.2d at 1105. *See also*, *e.g.*, *United States v. Texas Educ. Agency*, 600 F.2d 518, 527 (5th Cir. 1979) (the object of institutional reform "litigation is not to punish the [defendant] for its acts"); *Columbus Bd. of Educ. v. Penick*, 443 U.S.

449, 524 (1979) (Rehnquist, J., dissenting) ("there are no deterrence or retribution components of the rationale for a[n] [institutional reform] remedy").

And it is also true, "of course, that federal courts have no authority to address state officials out of office or to fire state employees or to take over the performance of their functions." *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781 (1978); *see also Kendrick v. Bland*, 740 F.2d 432, 440 n.5 (6th Cir. 1984). The court cannot circumvent this prohibition on firing state employees through its novel process, overseen by its own judicial officers, that is expressly designed to lead to the discipline (including possible termination) of MCSO officers.

The decision to re-open the investigations is not "remedial in nature," for it is not designed "as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken*, 433 U.S. at 280 (quotation marks omitted). Re-opening completed Internal Affairs investigations provides no relief whatever to Plaintiffs; again, the court below entered a separate order designed to provide compensation to class members whose constitutional rights had been violated. *See* ER05. And any argument that punishing MCSO officers for past alleged misconduct may deter future violations of the court's orders cannot be squared with the settled law prohibiting punitive equitable relief.

Nor may the court's effort to punish MCSO officers by reopening of their Internal Affairs investigations be justified under the court's civil contempt power. It does not coerce future compliance with court orders, and in any case, the court below admitted that there is "no need to use the Court's contempt power to coerce Defendants to comply with the preliminary injunction." ER222. And as just noted, re-opening closed investigations provides no remedy whatever to Plaintiffs. The MCSO officers here also have no opportunity to purge the relief ordered against them by coming into compliance with the court's orders. Indeed, a paradigmatic example of a criminal contempt proceeding occurs when a court seeks to impose punishment "retrospectively for a completed act of disobedience," *Bagwell*, 512 U.S. at 828 (quotation marks omitted), and the subject of such a proceeding is, of course, entitled to full criminal due process protections. Where the purpose of the re-opening of the investigations is "to penalize [the contemnor] and to deter others from engaging in similar conduct," *Falstaff*, 702 F.2d at 780, civil contempt will not lie. *See also McCrone v. United States*, 307 U.S. 61, 64 (1939) ("a contempt is considered civil when the punishment … is not intended as a deterrent to offenses against the public").

II.   **Judge Snow and the Monitor Must Be Disqualified**.

    A.   ***Ex Parte* Communications About the Merits Require Disqualification**.

This Court has observed time and again that "ex parte proceedings are anathema in our system of justice." *Guenther v. Comm'r*, 939 F.2d 758, 761 (9th Cir. 1991) (*Guenther II*) (quoting *United States v. Thompson*, 827 F.2d 1254, 1258–59 (9th Cir. 1987)). They "will not be tolerated," *Guenther v. Comm'r*, 889 F.2d 882, 884 (9th Cir. 1989), because " 'fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.' " *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)).

When a judge engages in *ex parte* communications about the merits of a case, the remedy is clear: that judge may not continue to preside over the case, and the judge's prior rulings must almost always be vacated. This Court held as much in *Guenther II*, where a tax court judge engaged in *ex parte* communications about the merits with Government counsel. This Court vacated the tax court's judgment and reassigned the case to a new "judge who has not been exposed to ex parte communications …." 939 F.2d at 762. Likewise, in *United States v. Alverson*, 666 F.2d 341, 350 (9th Cir. 1982), and *United States v. Wolfson*, 634 F.2d 1217, 1222 (9th Cir. 1980), the Court vacated sentences and required reassignment on remand because the original judges had engaged in improper *ex parte* communications about

the merits. *See also, e.g.*, *Cordoza v. Pacific States Steel Corp.*, 320 F.3d 989, 1000 (9th Cir. 2003) (*ex parte* communications "on the merits of a pending case" are improper and require recusal); *Hoptowit*, 682 F.2d at 1261 (recognizing that recusal is required when a judge "consider[s] facts outside the record in making his determination" about the merits); *Kensington*, 368 F.3d at 318; *United States v. Microsoft Corp.*, 253 F.3d 34, 112–13 (D.C. Cir. 2001); *Edgar*, 93 F.3d at 262. Courts are adamant about requiring reassignment because, once a judge has been exposed to information *ex parte*, "it is difficult, if not impossible, for a judge, no matter how sincere, to purge that information from her mind—and, equally, to maintain the perception of impartiality." *United States v. Craven*, 239 F.3d 91, 103 (1st Cir. 2001).

The cases enforcing the prohibition against *ex parte* communications rest upon multiple sources of authority. *First*, both this Court's inherent authority and its remand authority under 28 U.S.C. § 2106 authorize the Court to reassign a case to a new judge on a going-forward basis. *See, e.g.*, *Montrose Chem. Corp.*, 104 F.3d at 1521. "Reassignment requests usually arise from accusations that a judge engaged in improper outside communications." *Cobell v. Kempthorne*, 455 F.3d 317, 331 (D.C. Cir. 2006). Reassignment is required when a district judge exhibits personal bias. *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004). This Court will also reassign the case when: (1) "the original judge would reasonably be expected upon remand

44

to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected" or (2) "reassignment is advisable to preserve the appearance of justice." *Id.* The presence of either of these latter two factors supports reassignment, though courts may consider whether reassignment would entail "waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Earp v. Cullen*, 623 F.3d 1065, 1071–72 (9th Cir. 2010).

*Second*, Congress has required disqualification whenever a judge, *inter alia*, "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), or whenever the judge's "impartiality might reasonably be questioned," *id.* § 455(a). This Court has held that Section 455(b) requires recusal whenever a judge even "feels there is a risk of prejudice," while Section 455(a) requires recusal whenever "a reasonable third-party observer would perceive that there is a 'significant risk' that the judge will be influenced by the" alleged ground for recusal. *United States v. Holland*, 519 F.3d 909, 914–15 (9th Cir. 2008). Although the court below cited out-of-circuit decisions requiring Appellants to bear a "substantial burden" and produce "compelling evidence" of bias, ER243–44, that is not the law of this Circuit. *Holland* makes clear that a judge must be recused whenever there is "a risk of prejudice," and

that when "it is a close case, the balance tips in favor of recusal." 519 F.3d at 912, 915.

*Third*, bedrock due process principles also prohibit *ex parte* communications between the court and the Monitor. Whether a party "received due process depends on whether they had an opportunity to participate in determination of the relevant issues and on whether the *ex parte* [communications] unfairly prejudiced them." *Guenther I*, 889 F.2d at 884. The Due Process Clause requires reassignment where the judge has engaged in prejudicial *ex parte* communications about the merits with opposing counsel. *Guenther II*, 939 F.2d at 761.

This Court has reassigned cases without "imply[ing] that the district judge erred," *United States v. Quach*, 302 F.3d 1096, 1104 (9th Cir. 2002), including where it "believe[s] that on remand the district judge would be fair and impartial," *United States v. Reyes*, 313 F.3d 1152, 1160 (9th Cir. 2002).

### B.   The *Ex Parte* Conversations Between Judge Snow and the Monitor Require Reassignment.

Though Plaintiffs asked the court to authorize *ex parte* communications between the court and the Monitor, the Monitor Authority Order provides only that "[i]n carrying out [its] duties, the Monitor shall be permitted to have ex parte communications with the Parties." ER718. Thus, *ex parte* communications between the Monitor and *the court* are strictly prohibited. *See Edgar*, 93 F.3d at 258 (governing order forbade *ex parte* communications between the court and experts,

46

because the experts proposed that the court could communicate with them *ex parte* yet the "language was deleted before the order was entered").

Despite this prohibition, Judge Snow and the Monitor have engaged in extensive *ex parte* conversations about the merits. As detailed above, *supra* at pages 14–20, the conversations Judge Snow disclosed on the record covered many topics that are directly related to the Contempt Findings, Contempt Injunction, and criminal contempt referral. And it is clear that countless additional *ex parte* conversations that have not been disclosed on the record also took place, for Judge Snow candidly and repeatedly admitted that "the Monitor is in constant communication with the Court regarding the performance of his services," and that he had "regular, almost daily meetings with the Monitor when he is in Maricopa County, and frequent contact regarding developments and inquiries when he is not." ER629; *see also* ER651, ER667.

The Contempt Findings and Contempt Injunction address disputed issues that were the subject of the *ex parte* communications, and it would have been "surpassingly difficult for [Judge Snow] to disregard the" substance of its *ex parte* communications when he entered findings adverse to Appellants. *Craven*, 239 F.3d at 103. For example, the court found "considerable deficiencies" in MCSO's decision to close criminal investigations arising out of the Armendariz matter, ER172–73, and it favorably cited a Monitor report that was highly critical of those

47

investigations to support its conclusion "that a criminal investigation ought not to be foreclosed," ER182. In fact, the Monitor apparently first brought those investigations to Judge Snow's attention in an *ex parte* conversation; the Monitor's *ex parte* description of "the substance and quality of that investigation concerned [Judge Snow] considerably"; as a consequence of that conversation, Judge Snow "directed [the Monitor] to write [the] report" that later provided the basis for the Contempt Finding; and Judge Snow and the Monitor even consulted about the report during the drafting process. ER613–14.

There is a similar connection between many other Contempt Findings and Judge Snow's *ex parte* communications with the Monitor. For example, the Monitor complained *ex parte* to Judge Snow about MCSO's allegedly inadequate conflict-of-interest policies, ER551, and the court subsequently found that Internal Affairs had inadequate conflict-of-interest policies, ER141. An *ex parte* conversation with the Monitor about documents produced in connection with the Montgomery matter led Judge Snow to conclude "that previous testimony offered in this matter may have been untruthful," ER498, and the court subsequently found that the "investigation involving Mr. Montgomery demonstrates Sheriff Arpaio's many intentional misstatements under oath," ER133. Based on another *ex parte* conversation with the Monitor, Judge Snow came away with the belief that Chief Trombi had "frustrat[ed] the plan that had been arrived at by Chief Deputy Sheridan and the monitor," ER646,

48

and the court subsequently found that "[a]s a result of Chief Trombi's email … the approach agreed upon between the MCSO and the Monitor was not possible," ER109. At a bare minimum, these examples—to say nothing of the countless secret conversations that Judge Snow has not disclosed—created the *appearance,* and the likely reality, that the court's orders have been influenced by its improper *ex parte* conversations about the merits.

In these circumstances, the law is settled. When a district judge has engaged in unauthorized *ex parte* communications about the merits with its appointed judicial officer, he may not under any circumstances continue to preside over the case, and prior rulings typically must be vacated. *See, e.g.*, *Guenther II*, 939 F.2d at 762; *Alverson*, 666 F.2d at 350; *Wolfson*, 634 F.2d at 1222. Vacatur and reassignment are required to vitiate both actual and apparent bias. Reassignment is particularly warranted because of how difficult it will be for the judge to "put[ ] out of his or her mind" findings that were "based on evidence that must be rejected." *In re Ellis*, 356 F.3d at 1211.

This is not a case of first impression in the federal courts of appeals. The Third, Seventh, and D.C. Circuits have all recognized that when a judge engages in *ex parte* communications about the merits with a judicial officer, neither the judge nor the officer may continue to preside over the case.

The Seventh Circuit's decision in *Edgar* is materially indistinguishable from this case. *Edgar* involved a class action where the district court had appointed a panel of experts who were permitted to meet *ex parte* with members of the plaintiff class and defendants' employees. 93 F.3d at 257. As in this case, the governing order did not permit *ex parte* communications about the merits between the court and its experts, *id.* at 259, yet the experts did in fact meet *ex parte* with the judge, apparently to discuss the merits, *id.* at 257. The Seventh Circuit reassigned the case to a different judge and disqualified the experts. The court held that the judge had impermissibly obtained "personal knowledge of disputed evidentiary facts concerning the proceeding," *id.* at 258, and that the impropriety was "no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated," *id.* at 259. This Court has favorably cited *Edgar* for the proposition that reassignment is required when a district judge engages in *ex parte* communications with appointed advisors "on the merits of a pending case." *Cordoza*, 320 F.3d at 1000.

The Third Circuit's decision in *Kensington* is to the same effect, requiring reassignment where the judge had engaged in *ex parte* communications about the merits with the parties and experts appointed as judicial officers to assist the court. The Third Circuit held that the *ex parte* conversations between the judge and the parties were problematic because they were not "limited to procedural matters" but

rather "went to the very heart of the proceedings." 368 F.3d at 311. And the *ex parte* conversations between the judge and its biased experts "presented an even more egregious problem," *id.*, in part because the parties "could not respond to these 'silent' facts" alleged against them in the meetings, *id.* at 309. The *ex parte* communications in this case, no less than those in *Kensington*, "run contrary to our adversarial trial system" and require reassignment. *Id.* at 310.

The D.C. Circuit has likewise recognized that a judge must be disqualified when it engages in *ex parte* conversations about the merits with a court-appointed monitor or expert. The district court in *Brooks* had appointed monitors who had *ex parte* communications with the judge. *See* 383 F.3d at 1041. The D.C. Circuit did not reassign the case, but only because "the district judge has described 'the nature of the *ex parte* contacts,' and stated unequivocally that those contacts were of a procedural and not a substantive nature." *Id.* at 1044. Here, by contrast, the record unambiguously demonstrates that the *ex parte* discussions between Judge Snow and the Monitor concerned the merits. And unlike the judge in *Brooks*, Judge Snow has never suggested that the conversations were confined to procedural or administrative matters, nor could he on this record. In these circumstances, the D.C. Circuit made clear that reassignment is required.

## C.     The Evidence that Judge Snow "Hated" Arpaio and Sought To Drive Him from Office Requires Disqualification.

Karen Grissom told both Arpaio and an independent investigator (who deemed Grissom to be a credible witness) that Judge Snow's wife told her that the Judge "hates" Arpaio and wants him removed from office. *See supra* at pages 21–22. When Judge Snow learned these facts, he had an independent obligation to confirm or deny on the record whether his wife had made the statement, and more importantly, whether the statement accurately described his state of mind. In Section 455, Congress "place[d] the burden of maintaining impartiality and the appearance of impartiality on the judge …." *First Interstate Bank of Ariz.*, *NA* v. *Murphy*, *Weir & Butler*, 210 F.3d 983, 987 (9th Cir. 2000). Critical to satisfying that burden is faithfully discharging the "ethical duty to 'disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification.' " *American Textiles Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) (quoting *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995)).

Whether the Judge truly "hated" Arpaio and would "do anything to get [him] out of office," ER240, is plainly a matter that anyone would deem relevant to disqualification, yet Judge Snow chose to ignore that fundamental question in denying the recusal motion. Instead, he relied solely on the fact that Arpaio's former counsel had advised him that Grissom's information was flawed (even though

counsel's investigator found her and her husband to be credible) and on Appellants' lack of timeliness in raising the issue. *See* ER261–62. Neither point excuses Judge Snow from his obligation to place the information at his disposal on the record. Arpaio's former counsel had no way of knowing whether the reported statement of Judge Snow's wife accurately reflected Judge Snow's sentiments. And as explained in Part II.E, *infra*, if Judge Snow truly "hated" Arpaio and wished to drive him from office, Appellants' tardiness in bringing the recusal motion could not justify the Judge continuing to sit (though it may, under Ninth Circuit precedent, sometimes justify refusing to vacate rulings issued before the motion was brought).

Finally, this Court must consider events that took place after Judge Snow denied the recusal motion. Judge Snow insisted on holding a 21-day civil contempt hearing, lasting from April to November 2015, even though Arpaio and Sheridan had *admitted* to all of the facts alleged in Judge Snow's Order to Show Cause, had admitted to *additional facts* relating to the non-compliance with court orders, and had *consented* to a civil contempt citation. Doc. 948. And even though the hearing ended in November 2015, Judge Snow did not issue the civil contempt citation until May 2016, and he issued the remedial order in July. Most significantly, Judge Snow issued the criminal contempt referral on August 19, just eleven days before Arpaio stood for re-election in the Republican primary for Sheriff. Though Arpaio survived

the primary, he was defeated for re-election after the United States announced it would prosecute him for criminal contempt in mid-October.

### D. Judge Snow's Conflict Regarding His Brother-in-Law Also Requires Disqualification.

Judge Snow's conflict involving his brother-in-life also requires disqualification, both standing alone and in conjunction with the other grounds discussed. The Judicial Conference's Committee on Codes of Conduct has adopted a *per se* rule that when a judge's relative "is an equity partner in a law firm that represents a party, the judge *must recuse*." JUDICIAL CONFERENCE OF THE UNITED STATES, COMMITTEE ON CODES OF CONDUCT, Advisory Op. No. 58 (June 2009) (emphasis added), https://goo.gl/1EyJry. The Fifth Circuit has likewise held that "when a partner in a law firm is related to a judge within the third degree, that partner will always be 'known by the judge to have an interest that could be substantially affected by the outcome' " under Section 455(b)(5)(iii), such that disqualification is mandatory. *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1113 (5th Cir. 1980).

The court below rejected these authorities and elected instead to follow the Second Circuit's rule that disqualification is *sometimes* but not *always* required. *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83–84 (2d Cir. 1996). This holding is inconsistent with the text of the statute and the relevant judicial canons, which require disqualification whenever the relative has "an *interest* that *could* be

54

substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(iii) (emphases added). Equity partners in law firms undoubtedly have a reputational interest, and they may have a financial interest, in proceedings before their relative, and the outcome of any case has the potential to substantially affect those reputational or financial interests.

Disqualification is also required under Section 455(a). Judge Snow failed to disclose the conflict involving his brother-in-law from the parties when he first learned of it in 2010. That decision has created a powerful appearance of bias. When confronted with the conflict in 2012, Judge Snow admitted that "it would have been the better course to notify the parties at the time" about the conflict, and that an ethics committee likewise recommends that " 'disclosure is the better practice.' " ER916 (quoting Ill. Judicial Ethics Comm., Op. 94–18). But in his 2015 opinion refusing to recuse based on this conflict, Judge Snow suggested inaccurately that it was *he* who first "raised" the conflict with the parties in 2012. *See* ER264.

And Judge Snow's decision *not* to disclose the conflict necessarily meant that the initial decision not to recuse was not based on all of the relevant facts. Judge Snow has admitted that the question whether he must be disqualified turned in part on whether his brother-in-law received a share of Covington's fees from the case, ER916, but no effort was made when the conflict first arose to determine whether the Judge's relative would be screened from participating and receiving fees. When

55

the issue was finally brought to light in 2012, Plaintiffs belatedly represented that Judge Snow's brother-in-law would be screened, but only after Judge Snow had awarded Covington nearly $100,000 in attorneys' fees at a time when only he knew that his relative might share in those fees.

After the conflict was finally disclosed by Covington, Judge Snow asked Defendants to waive, and they did so to avoid delaying resolution of a case that had already significantly impaired their financial and reputational well-being. *See* ER909–10; ER901. Arpaio's waiver of the conflict is null and void as a matter of law because Congress has flatly prohibited judges from "accept[ing] from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)." 28 U.S.C. § 455(e). Moreover, neither Sheridan nor Sousa were litigants at that time, so Arpaio's waiver cannot be effective as to them.

### E.     Timeliness Concerns Cannot Bar Disqualification in This Case.

This Court has repeatedly held that timeliness concerns do not bar the Court from exercising its inherent power or authority under 28 U.S.C. § 2106 to reassign a case to a new judge who has not engaged in unauthorized *ex parte* conversations. In *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 780 (9th Cir. 1986), for example, the Court held that the judicial recusal statutes could not bar a request that it determine, in the first instance, whether the district judge had created an appearance of bias, requiring reassignment pursuant to the Court's inherent powers.

The Court reaffirmed that rule in *Montrose Chemical Corp.*, 104 F.3d at 1521, holding that a recusal motion under Section 455 was untimely, but nevertheless proceeding to consider, *de novo*, a request for reassignment under Section 2106 because the district judge was biased. *See also Alverson*, 666 F.2d at 348 n.6.

Timeliness also cannot bar Appellants' request for prospective recusal under Section 455. As the Third Circuit has twice recognized, timeliness will not bar requests for prospective recusal, lest a judge with a patent bias be allowed to continue to preside over the case. *Kensington*, 368 F.3d at 316–17; *United States v. Furst*, 886 F.2d 558, 579–81 (3d Cir. 1989).

To be sure, this Court has stated in some cases that a litigant should not be allowed to use an untimely recusal motion to *vacate prior rulings* and thus give litigants a "second bite at the apple." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1295 (9th Cir. 1992); *but see In re Manoa Fin. Co.*, 781 F.2d 1370, 1373 (9th Cir. 1986) ("failure to move for recusal at the trial level does not preclude his raising the issue on appeal"). But Appellants do not seek vacatur of any rulings entered prior to the submission of their 2015 recusal motion, and as just noted, in cases in which further proceedings before the trial court are contemplated, courts have held that timeliness cannot bar a request for prospective reassignment. *Kensington*, 368 F.3d at 316–17; *Furst*, 886 F.2d at 579–81.

This Court, too, routinely addresses recusal requests on the merits when further proceedings are contemplated, even if it sometimes alternatively denies the request as untimely.[12] In other words, the "refusal of courts to 'start over' has rested not on the mere passage of time, but on the events that had occurred and the balancing of equity/fairness considerations in deciding whether to expunge those events from history's pages." *Polaroid Corp. v. Eastman Kodak Co.*, 867 F.2d 1415, 1419 (Fed. Cir. 1989) (citing, *inter alia*, *United States v. Conforte*, 624 F.2d 869, 879 (9th Cir. 1980)). Concerns about a "second bite at the apple" are simply not implicated where, as here, Appellants do not seek vacatur of any rulings entered prior to the filing of the 2015 recusal motion; and such concerns are most definitely not implicated to the extent Appellants ask the Court to disqualify Judge Snow prospectively.[13]

---

[12] *See, e.g.*, *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997); *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 871 (9th Cir. 1991); *Salmeron v. United States*, 724 F.2d 1357, 1365 n.5 (9th Cir. 1983).

[13] For the reasons well stated by Judge Shedd in *Kolon Industries, Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 180–84 (4th Cir. 2014) (dissenting opinion); *see also Polaroid*, 867 F.2d at 1418; *SCA Servs. v. Morgan*, 557 F.2d 110, 117 (7th Cir. 1977), we respectfully submit that recusal motions brought pursuant to 28 U.S.C. § 455 may not be rejected on timeliness grounds even in cases in which retrospective relief is sought. We acknowledge that this Court has taken a contrary view, *see United States v. Rogers*, 119 F.3d 1377, 1382 (9th Cir. 1997), but we nevertheless press the point here for possible review by the en banc Court or the Supreme Court.

Of course, even if timeliness could bar consideration of the arguments concerning Judge Snow's wife's reported statement and his brother-in-law's relationship to Plaintiffs' counsel, Defendants repeatedly objected to *ex parte* communications between the district court and the monitor. They objected first when the court entered the Monitor Authority Order, and the district court agreed not to authorize *ex parte* communications between it and the Monitor. ER718, 732–33. And when Defendants renewed their objection, the district court twice emphasized that Defendants have "preserved" their objection. ER410.

## CONCLUSION

Appellants respectfully submit that the Court should vacate the Contempt Findings and the Contempt Injunction, and remand with instructions to reassign the case to another district judge and appoint a new Monitor.

December 27, 2016                                  Respectfully submitted,

                                                   s/ Charles J. Cooper

John T. Masterson                                  Charles J. Cooper
Joseph J. Popolizio                                Michael W. Kirk
Justin M. Ackerman                                 COOPER & KIRK, PLLC
JONES, SKELTON & HOCHULI, P.L.C.                   1523 New Hampshire Avenue, N.W.
40 North Central Avenue                            Washington, D.C. 20036
Suite 2700                                         (202) 220-9600
Phoenix, AZ 85004                                  (202) 220-9601 (fax)
(602) 263-1700                                     ccooper@cooperkirk.com
(602) 200-7846 (fax)
jmasterson@jshfirm.com

*Counsel for Defendant-Appellant Joseph Arpaio and*
*Non-Party-Appellants Gerard Sheridan and Joseph Sousa*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellants Joseph M. Arpaio, Gerard Sheridan, and Joseph Sousa identify the following related cases that are currently pending in this Court:

1. ***Melendres v. Sands*, No. 16-16659.** This case involves an appeal by non-party civil contemnor Brian Sands to the same second supplemental permanent injunction/judgment order that is the subject of this appeal, as well as certain other interlocutory non-final orders subordinate to that order.

2. ***Melendres v. Maricopa County*, No. 16-16661.** This case involves an appeal by Defendant Maricopa County to the same second supplemental permanent injunction/judgment order that is the subject of this appeal, as well as certain other interlocutory non-final orders subordinate to that order.

3. ***In re Dennis Montgomery*, No. 16-73233.** This case involves a request that this Court issue a writ of mandamus directing the District Court to admit two attorneys *pro hac vice* on behalf of a non-party. On December 9, 2016, a panel of this Court denied mandamus relief. The mandate has not yet issued.

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

**Page**

28 U.S.C. § 455 .......................................................................................SA2

28 U.S.C. § 2106 ....................................................................................SA5

## 28 U.S.C. § 455. Disqualification of justice, judge, or magistrate judge.

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(i) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may

be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

(f) Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

## 28 U.S.C. § 2106. Determination.

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-16663

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 13,996 words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ Charles J. Cooper | Date Dec 27, 2016

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on this 27th day of December, 2016.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that one participant in the case is not a registered CM/ECF user. On this 27th day of December, 2016, I have dispatched the foregoing document and the contemporaneously filed excerpts of record by First-Class Mail to the following non-CM/ECF participant:

Timothy D. Mygatt
United States Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271

s/ Charles J. Cooper
Charles J. Cooper